UNITED STATES DISTRICT COURT
FOR WESTERN DISTRICT OF KENTUCKY
AT PADUCAH

*ELECTRONICALLY FILED*

| | | |
|---|---|---|
| HEATHER ALVEY | ) | Civil Action No.  5:17-CV-00023-TBR |
| | ) | |
| PLAINTIFF | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STATE FARM FIRE AND CASUALTY | ) | |
| COMPANY | ) | |
| | ) | |
| DEFENDANT | ) | |
| | ) | |

\*\*\*\*\*

## DEFENDANT STATE FARM'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Comes the Defendant, State Farm Fire and Casualty Company ("State Farm"), by counsel, and for its Memorandum of Law in Support of Motion for Summary Judgment, states as follows:

## INTRODUCTION

This action arises out of a fire to the home being rented by the plaintiff, Heather Alvey ("Alvey"), in Paducah, Kentucky on or about February 22, 2016.  Alvey had a renters policy with State Farm that in part insured the contents of the home.  State Farm investigated and denied the claim on the grounds that the fire was intentionally set and Alvey had motive and opportunity to burn the home; that Alvey made material misrepresentations in the presentation of her claim that voided the policy; and that Alvey failed to comply with her duties to cooperate under the policy.  Alvey then sued State Farm for breach of contract and bad faith in state court which State Farm thereafter removed based on diversity jurisdiction.

The parties have completed discovery and the case is ripe for summary judgment. Alvey has admitted that she made misrepresentations regarding her whereabouts at or around the time of the fire, her prior insurance history, and her financial status at the time of the fire. Because these misrepresentations were material to State Farm's investigation, Alvey's contract claim is barred by State Farm's concealment or fraud policy provision as a matter of law. Alvey's bad faith claims must also be dismissed because State Farm has no contractual obligation to pay her claim, State Farm had a reasonable basis for its denial, and there's no evidence that State Farm engaged in any intentional misconduct that would support a bad faith claim.

## STATEMENT OF FACTS

## I.    FIRE LOSS TO RENTAL HOME

### A.    Background

Alvey moved to Paducah, Kentucky in March 2015 as a result of a separation from her husband, Shane Alvey.[1] Her divorce became final in April 2015 and they began sharing custody of their three younger children - Conner, Carson, and Kinley.[2] As part of the divorce agreement, Alvey received just over $30,000 in May 2015, some of which she used to prepay rent to Chris Presswood for May to October 2015 to rent the home in question at 315 Kennedy Road in Paducah.[3]

In August 2015, Alvey applied for a job at Mass Mutual selling life insurance which position she started shortly thereafter.[4] She did not receive any alimony in the divorce agreement and needed a job for income.[5] As of October 2015, however, Alvey had spent nearly all of the $30,000, her bank balance was reduced to $70.23, and she began incurring overdraft fees of

---

[1]    Alvey Depo., pp. 9-10 – cited pages attached as Ex. A.
[2]    Alvey Examination Under Oath ("EUO"), pp. 10-14 – cited pages attached as Ex. B.
[3]    Alvey Depo., pp. 33-35; Alvey EUO, pp. 17-19.
[4]    Alvey Depo., p. 16-17.
[5]    *Id.*

$239.65.[6]  Further, though she received an initial payment from Mass Mutual (a/k/a Capital Finance), by the time of the fire she had not received any commission checks and Capital Finance owed her up to $3,900.[7]

Before her divorce Alvey had worked for Nationwide Insurance Company for a local Paducah office, the Kim Homra Insurance Agency, in 2012 and 2013 selling property and casualty insurance policies.[8]  Prior to the fire, among other policies Alvey had a tenant policy with Nationwide which was effective July 14, 2015. [9]  Alvey also obtained coverage for a 14K white gold wedding band for $1,195.00 and attempted to add coverage for a $36,000 ladies 18K white gold ring.[10]

Nationwide declined to cover the ring because Alvey failed to provide either a bill of sale for the ring or an appraisal approved by a certified gemologist.[11]  Shortly thereafter this failed attempt to add coverage for the ring, Nationwide cancelled the tenant policy effective September 5, 2015 for Alvey's failure to pay her insurance premium.[12]  Alvey made no attempt to have the tenant policy reinstated after it was canceled.[13]

After going without insurance for over four months, in January 2016 Alvey obtained renters insurance with State Farm and increased her level of coverage on the contents from $95,000 to $100,000.[14]  Using the uncertified appraisal that Nationwide had rejected, Alvey also

---

[6]     Alvey Depo., pp. 39-40.
[7]     Alvey EUO, pp. 31-32.
[8]     Homra Depo., pp. 7-8 – cited pages attached as Ex. C.
[9]     *Id.* at 11.
[10]    *Id.* at 17-18.
[11]    *Id.* at 19, 37-38.
[12]    *Id.* at 20-22.
[13]    *Id.* at 39.
[14]    Alvey EUO, pp. 52-55.

purchased a personal articles policy from State Farm on the ring with coverage of $38,790.00.[15] Alvey had purchased the ring for about only $16,000.00.[16]

**B.    <u>Reported Discovery of Fire</u>**

Alvey began dating Tony Standley, a fireman who lived in the Nashville, Tennessee area, in October 2015.[17]  Alvey never lived with him but stayed with him often on the weekends and intended on having a long-term relationship.[18]

On Friday, February 19, 2016, Alvey left her rental home, took her kids to school, and went in to the office for a short time with a plan to visit Standley in Tennessee.[19]  Alvey left her Paducah home with the three children at 8:00 or 8:15 a.m., worked at her office until 9:00 or 9:15 a.m., and then arrived at the Capital Finance Nashville office at around noon and had lunch with Standley.[20]  Alvey's ex-husband, Shane Alvey, picked the children up from school that day and kept them for the weekend.[21]

Alvey stayed with Standley that weekend and they returned to Paducah together on Monday, February 22, 2016 at around 2:00 p.m.[22]  Standley took her to a doctor's appointment, went to Gander Mountain afterward, and they arrived at Alvey's home at around 4:00 p.m.[23] Alvey unlocked the door and Standley smelled smoke and told her to wait outside.[24]  Standley

---

[15]    Alvey Recorded Statement, p. 10 – cited pages attached as Ex. D; Personal Articles Policy Declarations Page attached as Ex. E.
[16]    Alvey EUO, p. 57.
[17]    Alvey EUO, p. 65.
[18]    *Id.* at 66-67.
[19]    *Id.* at 77.
[20]    *Id.* at 78-80.
[21]    Shane Alvey Depo., p. 64 – cited pages attached as Ex. F.
[22]    Alvey EUO, pp.95-96.
[23]    *Id.* at 96.
[24]    *Id.* at 98.

went into the house first and discovered that there had been a fire in the living room/family room.[25]   There was no fire at the time and Alvey called the local fire department.

Alvey called the non-emergency number for the Paducah Fire Department, and Deputy Fire Chief Greg Cherry ("Chief Cherry") went to the scene where Alvey told him that she had returned home and discovered that she had had a fire at her house.[26]   Chief Cherry observed no signs of forced entry and Alvey did not indicate that anything had been ransacked or strewn about the house.[27]   Upon entry Chief Cherry noted light smoke damage throughout the home with all fire damage in the room of origin which was a room being used as a den or T.V. room.[28] Chief Cherry concluded that the door between the den and kitchen had been closed based on the fire and smoke patterns.[29]

Chief Cherry determined that the area of origin in the den appeared to be in front of a sectional couch.[30]   He believed that the fire was suspicious because he did not see any indication for an accidental fire.[31]   After Alvey walked through some of the house, she told him that some jewelry and money were missing which led him to contact the local police department as a possible theft case.[32]

Patrol Officer Austin Guill of the Paducah Police Department then arrived at the scene. Based on the reported items missing, he looked for any signs of forced entry for burglary and found no evidence that the house had been broken into or the contents searched.[33]   While at the scene, Alvey reported to him that approximately $1,500.00 in cash and four pieces of jewelry

---

[25]     *Id.* at 98-99.
[26]     Chief Cherry Depo., p. 14 – cited pages attached as Ex. G.
[27]     *Id.* at 37.
[28]     *Id.* at 20.
[29]     *Id.* at 21-22.
[30]     *Id.* at 26.
[31]     *Id.* at 52, 64.
[32]     *Id.* at 47, 65.
[33]     Officer Guill Depo., pp. 8-10, 14 – cited pages attached as Ex. H.

with a value of $500.00 was missing.[34]  She did not report that there was a $36,000.00 ring missing.[35]  Officer Guill then consulted with his patrol supervisor and determined that a detective needed to investigate further.[36]

Detective Beau Green of the Paducah Police Department was called out in part because Chief Cherry determined that the fire was suspicious and he arrived on the scene around 5:58 p.m. in part to investigate a possible arson.[37]  Chief Cherry indicated that there was small signature of an accelerant detected on the carpet near the coffee table in the room of origin and requested that he take samples which he sent to the KSP Lab – the samples did not test positive for an accelerant.[38]  Chief Cherry had told him that the fire had burned out about 10-12 hours before Chief Cherry had arrived at the scene.[39]

Given the possible burglary, Detective Green also looked for any signs of criminal activity, or evidence of pilfering or ransacking, and found none.[40]  During his walk-through with Alvey, she reported that she was missing $1,500.00 in cash from a compartment on top of the jewelry box and a wedding ring set valued at $30,000.00.[41]  Detective Green observed that there was a layer of soot across the contents of the home including the jewelry box on top of which sat some little trinkets and a towel.[42]  Although the drawer to the jewelry box where the ring set was purportedly kept could have been opened, Detective Green stated that there was no way for Alvey to have opened the top compartment of the jewelry box and discover the missing cash

---

[34]     *Id.* at 21-22.
[35]     *Id.* at 22.
[36]     *Id.* at 27.
[37]     Detective Green Depo., pp. 12, 18-19 – cited pages attached as Ex. I.
[38]     *Id.* at 19-21.
[39]     *Id.* at 21.
[40]     *Id.* at 24, 36.
[41]     *Id.* at 25.
[42]     *Id.* at 25-26.

without disturbing the layer of soot.[43]  Other than the cash and jewelry, Alvey did not report that any other items had been stolen such as valuable brand name purses in her closet.[44]

Detective Green recalled that Alvey mentioned something about her kids throwing paper into a ceiling fan or lamp in the den where the fire occurred.[45]  He and Chief Cherry interviewed the children, however, and after speaking with them, did not change the charge in the case from arson.[46]  More than a year later, in July 2017, Alvey advised Detective Green that she had found her wedding set in her daughter's jewelry box but never withdrew the claim for the missing cash.[47]

### C.    Claim with State Farm

Alvey reported the loss to State Farm which began its investigation.  Alvey eventually submitted a claim for $100,000.00 for fire and smoke-damaged contents of the home and initially made a claim for the missing wedding set ring and jewelry for over $36,000.00.[48] On February 24, 2016, State Farm's Special Investigative Unit ("SIU") accepted ownership of the file based on the presence of multiple National Insurance Crime Bureau ("NICB") fraud indicators including the following:

- New policy issued less than 2 months before loss

- No one home at the time of the fire

- Insured is claiming theft of cash and jewelry

- Insured is claiming theft yet no signs of forced entry

- Purchase of limits seem excessive for amount of contents in home

---

[43]    *Id.* at 25-31, 40-41.
[44]    *Id.* at 42.
[45]    *Id.* at 48-49.
[46]    *Id.* at 53-54.
[47]    *Id.* at 45-46, 127.
[48]    Proof of Loss dated April 21, 2016 - attached as Ex. J; Alvey Recorded Statement, pp. 10, 37-38.

- During initial visit insured had inconsistencies in her story

- Fire began in the middle of the room away from any electrical outlets or appliances[49]

State Farm also retained a fire investigation expert, Kevin Dunn, who completed an inspection of the scene. Mr. Dunn concluded that the fire originated in the family room on or around an ottoman in the middle of the room and ruled out any accidental ignition sources that could have caused or contributed to the fire.[50]   In part because the fire appeared to be intentionally set, State Farm then began considering who might have opportunity and motive to burn the rental home.  As part of her investigation, SIU Claim Specialist Debra Massie ("CS Massie") obtained a recorded statement from Alvey on March 8, 2016.

In the statement CS Massie requested that Alvey specifically describe her whereabouts from the time she left the home on the morning of Friday, February 19, 2016 until she and Standley discovered the fire on the afternoon of Monday, February 22, 2016.  Alvey explained that on Friday morning she drove her kids to Conrad Elementary, went to her office in Paducah for some time, and left at around 10:00 a.m. to go to Nashville where she arrived at about noon and had lunch with Standley.[51]   She stayed with Standley Friday night, went to a birthday party and basketball games for his daughter on Saturday, and then attended a work banquet that night.[52]  CS Massie specifically asked what Alvey did on that Sunday and Monday as follows:

> Q.    Good.  And then Sunday, what did you do all day Sunday?
>
> A.    Oh, he worked.  I stayed home most of the day.  And just did…didn't do much of anything.  Um, and I went to the fire station on Monday (sic) afternoon.  I was at the fire station until about…actually…

---

[49]    Claim File Notes attached as Ex. K.

[50]    Lee Depo on May 3, 2018, pp. 21-22 –cited pages attached as Ex. L; State Farm Expert Disclosures dated November 22, 2017 (DE 19) - Dunn Report dated March 26, 2016.

[51]    Alvey Recorded Statement, pp.24- 25.

[52]    *Id.* at 26-27.

Q.      Sunday or Monday?

A.      Sunday.

Q.      Okay.  Uh, so…

A.      Yeah, he worked Sunday.  He had to work.  So, he goes in
        at six o'clock, or well he goes in at like 5:30.  But…

Q.      P.M.?

A.      Morning.

Q.      Okay.

A.      They work 24 hours.  So…

Q.      I see.

A.      …he goes in.  So, I just went.  And um, I ate lunch there or
        not…in the afternoon.  And I think I left about 9:00 or
        10:00.

Q.      At night?

A.      Um-hum.

Q.      And stayed uh…did you go back to his…his house…

A.      Yeah.

Q.      …after that then?

A.      Yeah.

Q.      And uh, so from 9:00 or 10:00 at night…that night, then
        Monday morning uh, what did you do?

A.      We got up.  And office…I'm trying to think of what time.
        About 10:30…10:00.  Probably about 10:00 we left.  And it
        takes about 30 minutes to get to Brentwood from there.  I
        had to run in the office.  And pick up some stuff.  And then
        went and ate lunch.  And then headed home.[53]

---

[53] *Id.* at 28.

Alvey stated that she and Standley arrived at her home on Monday afternoon, dropped off one of their vehicles, then went to her doctor's appointment and Gander Mountain before coming back home in the afternoon on Monday to discover that a fire had occurred in the living room.[54]

CS Massie also questioned whether Alvey might have had a financial or profit motive to start the fire by generally inquiring into Alvey's financial status at the time of the fire. Alvey stated that she had no outstanding liens or judgments against her and no outstanding unpaid medical bills.[55] Alvey also identified credit cards that she had with various retailers and a Visa with monthly balances ranging from $25.00 - $3,000.00 along with a loan on her vehicle and a personal finance loan of approximately $2,800.00.[56]

Similarly, CS Massie inquired about Alvey's insurance history. Alvey stated that she switched her renters insurance from Nationwide to State Farm for cheaper rates.[57] Alvey also wanted coverage on her wedding rings of up to $36,000.00 though she planned to lower it to $25,000.00 at a later date.[58] CS Massie specifically asked if Alvey had ever been canceled:

> Q.    …at some point. Okay. So, have you ever been cancelled by an insurance company for anything?
>
> A.    No.[59]

CS Massie also asked Alvey about previous fire losses and she identified a 2012 lightning strike, denied any prior theft losses, and specifically denied any other insurance claims:

> Q.    Have you made any other type of insurance claims in the past other than the fire loss at your home in Metropolis and…
>
> A.    No.[60]

---

[54]    *Id.* at 29-31.
[55]    *Id.* at 13-14.
[56]    *Id.* at 14-16.
[57]    *Id.* at 8-9.
[58]    *Id.* at 10-11.
[59]    *Id.* at 11.

Following the recorded statement, State Farm continued to investigate these issues, spoke with witnesses and obtained relevant records which in part indicated that Alvey had not been truthful in her recorded statement on multiple issues. To further explore these issues and other evidence, State Farm obtained an Examination Under Oath ("EUO") of Alvey on June 15, 2016, in accordance with the policy provisions.

As to her financial status, Alvey again insisted that before the fire loss she did not have any medical bill debt.[61] She also claimed that leading up to the fire she was current on all debts and bills.[62] She further stated that she did not know if she had received any notices that her bank balances were overdrawn.[63]

As to her insurance history, Alvey insisted that the only reason she switched from Nationwide to State Farm is because her premium rates kept going up.[64] For the first time, she also disclosed that in addition to the lightning loss, she had presented an insurance claim for a lost wedding ring. She told her insurance company at the time that she thought her one-year old son, Conner, had flushed a wedding ring down the toilet and received approximately $18,000.00 for the allegedly missing ring.[65]

Alvey also disclosed for the first time that, contrary to her prior statements, Alvey had actually returned to her home in Paducah on the afternoon of Sunday, February 21, 2016. She claimed that she got into an argument with Standley on Sunday afternoon and then made the two-hour drive from Nashville to Paducah after the argument.[66] She claimed that she went

---

[60]     *Id.* at 12.
[61]     Alvey EUO, p. 161.
[62]     *Id.* at 158.
[63]     *Id.* at 34-35.
[64]     *Id.* at 42, 50-52.
[65]     *Id.* at 47-50.
[66]     *Id.* at 82-86.

home, realized that she still needed to pick up a work check from the Nashville office, and drove back the two hours to Standley:

> Q.    Where did you go?
>
> A.    I came to Paducah.  Got off my exit.  Pulled in my driveway and went, oh crap.  I have to go pick that check up tomorrow.  So I had to go back.  So I went back to the house and went Monday and picked up my check and brought it home and went to the doctor Tuesday.
>
> Q.    Okay.  So…
>
> A.    or Monday.  Sorry.[67]

Although Standley was supposed to have gone to Paducah with her the next day to her doctor's appointment, Alvey claimed that he could not have picked up the check and brought it with him.[68]  Alvey also insisted that though she drove to her house and stopped in the driveway, she looked at her checkbook and immediately returned to Tennessee without going in the home.[69]  Alvey was questioned why she had never disclosed this information previously:

> Q.    Okay.  Have you ever told anybody about that?
>
> A.    No.
>
> Q.    Okay.
>
> A.    I didn't really particularly want to tell people I had financial issues, that I needed to go back and get an $1,800.00 check.  Especially after you-all are accusing me of basically whatever.
>
> Q.    So you admit that you did not tell that to State Farm when they initially talked to you?
>
> A.    Well, I didn't go in the house.  They asked me about when I went back in the house and I did not.[70]

---

[67]    *Id.* at 86.
[68]    *Id.* at 87-88.
[69]    *Id.* at 88-89.
[70]    *Id.* at 89.

Alvey also testified that she found her wedding ring in her daughter's jewelry box after the fire and withdrew that claim.[71]

### D.    <u>Denial and Lawsuit</u>

After completing its investigation, on or about September 7, 2016, State Farm decided to deny Alvey's claim for insurance benefits on three grounds.  State Farm concluded that Alvey had breached her contract by committing arson, making material misrepresentations in the presentation of her claim, and failing to follow policy duties requiring her to mitigate her damages and comply with document requests.[72]

On January 31, 2017, Alvey filed a Complaint in McCracken Circuit Court for breach of contract in failing to fully pay her insurance claim, common law and statutory bad faith, and for declaratory judgment.  State Farm thereafter removed the case to federal court under diversity jurisdiction.  Alvey has contended that she has coverage primarily on the grounds that the fire was accidental.  The parties have completed discovery and made expert disclosures, and the matter is ripe for summary judgment under the concealment or fraud provision of State Farm's policy.

### <u>STANDARDS FOR DECISION</u>

### I.    SUMMARY JUDGMENT STANDARD

Summary judgment shall be rendered if the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  The United States Supreme Court in *Celotex Corp. v. Catrett*,[73] held that the burden of proving that an issue for trial exists rests with the non-moving party once the

---

[71]     *Id.* at 8.
[72]     Lee Depo on May 3, 2018, pp. 15-19.
[73]     477 U.S. 317 (1986).

movant has identified those portions of the record that demonstrate the lack of a genuine issue of fact for trial:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.[74]

In *Anderson v. Liberty Lobby, Inc.*,[75] the United States Supreme Court equated the standard for summary judgment with the standard for a directed verdict. A judge's function is to determine whether there is a genuine issue for trial. The Court stated that "there is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party."[76]

The mere existence of a scintilla of evidence in support of plaintiff's position is insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.[77] Here, there are no genuine issues of material fact and State Farm is entitled to summary judgment as a matter of law.

## II.    INSURANCE POLICY INTERPRETATION

In exercising diversity jurisdiction, this Court must apply state law in accordance with the controlling decisions of the highest state court of the forum state.[78] Under Kentucky law, interpretation and construction of an insurance contract is a matter of law for the court.[79]

Generally, the terms and conditions of a contract of insurance control the contractual relationship between the insurer and insured absent contravention of public policy or statute.[80]

---

[74]    *Id*. at 322.
[75]    477 U.S. 242 (1986).
[76]    *Id.* at 249.
[77]    *Id.* at 252 (citations omitted).
[78]    *Bailey Farms, Inc. v. NOR-AM Chem. Co.*, 27 F.3d 188, 191 (6th Cir. 1994)
[79]    *Kemper v. Heaven Hill Distilleries*, 82 S.W.3d 869, 871 (Ky. 2002)
[80]    *Meyers v. Kentucky Medical Ins. Co.*, 982 S.W.2d 203, 208 (Ky. App. 1997).

An insurance policy must receive a reasonable interpretation consistent with the parties' object and intent if narrowly expressed in the plain meaning or language of the policy.[81]

The terms of an insurance policy are enforceable as written absent a statute to the contrary.[82]  A court should not rewrite an insurance policy to enlarge the risk to the insurer.[83]  A coverage determination based on undisputed material facts is generally a question of law for the court.[84]

Exclusions in insurance policies are to be narrowly construed to effectuate coverage, but this strict construction should not overcome "plain clear language resulting in a strained or forced construction."[85]  "Reasonable conditions, restrictions, and limitations on insurance coverage are not deemed *per se* to be contrary to public policy."[86]  In particular, "[w]hen the terms of an insurance contract are unambiguous and not unreasonable, they will be enforced."[87]

Though ambiguous terms must be interpreted in favor of the insured's reasonable expectations of coverage, "only actual ambiguities, not fanciful ones, will trigger application of the doctrine."[88]  A non-existent ambiguity should not be utilized to resolve a policy against an insured, and the mere fact that a party attempts to "muddy the water and create some question of interpretation does not necessarily create an ambiguity."[89]  Under Kentucky law, "a contract is ambiguous if a reasonable person would find it susceptible to different or inconsistent interpretations."[90]

---

[81]   *St. Paul Fire & Marine Ins. Co. v. Powell-Walton-Milward*, 870 S.W.2d 223, 226 (Ky. 1994).
[82]   *Masler v. State Farm Mutual. Auto. Ins. Co.*, 894 S.W.2d 633, 636 (Ky. 1995).
[83]   *St. Paul Fire & Marine Ins. Co.*, 870 S.W.2d at 226.
[84]   *See Cincinnati Ins. Co. v. Vance*, 730 S.W.2d 521, 524 (Ky. 1987).
[85]   *Kemper, supra,* 82 S.W.3d at 873-74.
[86]   *Snow v. West American Ins. Co.*, 161 S.W.3d 338, 341 (Ky. App. 2004).
[87]   *Ky. Assoc. of Counties All Lines Funds Trust v. McClendon*, 157 S.W.3d 626, 630 (Ky. 2005).
[88]   *True v. Raines*, 99 S.W.3d 439, 443 (Ky. 2003).
[89]   *Ky. Assoc. of Counties All Lines Funds Trust*, 157 S.W.3d at 633-34 (citations omitted).
[90]   *Wehr Constructors, Inc. v. Assurance Co. of America*, 384 S.W.3d 680, 687 (Ky. 2012) (citation omitted).

## ARGUMENT

**I.    ALVEY'S CONTRACT CLAIM MUST BE DISMISSED UNDER THE CONCEALMENT OR FRAUD PROVISION BASED ON HER INTENTIONAL MATERIAL MISREPRESENTATIONS.**

### A.    Material Misrepresentations:  Policy Provision and Applicable Standards of Law

State Farm's renters policy provides two basic coverages - property coverage and personal liability coverage.  At issue in the case at hand is the policy's property coverage under Section I which in part insures Alvey's personal property for "accidental direct physical loss to property described in Coverage B caused by the following perils" which includes fire.[91]  State Farm has significant evidence that this fire was not an "accidental" fire and that Alvey had both opportunity and motive to burn the home.  For purposes of this Motion only, however, State Farm will assume that the policy extends property coverage for the fire loss at issue.

State Farm's policy, however, also contains a provision which voids the policy if the insured makes material misrepresentations before or after a loss:

> 2.  **Concealment or Fraud.**  This policy is void as to you and any other **insured**, if you or any other **insured** under this policy has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance, whether before or after a loss.[92]

Courts have uniformly upheld policy provisions that preclude recovery where the insured misrepresents material facts surrounding the loss or claim.  In *Home Ins. Co. v. Hardin*,[93] the Kentucky Supreme Court in a 1975 decision held that the insured's misrepresentation of his personal property claimed to have been lost in a fire voided the *entire* policy as a matter of law:

---

[91]    Section I – Losses Insured, (p. 7) – Certified Copy of Renters Policy attached as Ex M.
[92]    Section I and II – Conditions, ¶ 2 (p. 17).
[93]    528 S.W.2d 723 (Ky. 1975)

> We conclude that the provisions of the insurance policy as to concealment and fraud are applicable here and that a sworn proof of loss which includes numerous nonexistent items *voids the entire policy as a matter of law.*[94]

In so doing, the Court agreed with a prior Kentucky court which held:

> The provision is common to most fire insurance policies and is uniformly held valid so that it will defeat a recovery under the contract if false statements in proof of loss were intentionally made and disclose a purpose to fraudulently overvalue the property or include non-existent items.[95]

Following the precedent, federal courts have likewise enforced concealment or fraud provisions as valid and enforceable:

> Concealment and fraud provisions are uniformly held valid so as to defeat recovery under insurance policy if insureds intentionally make false statements.[96]

A misrepresentation is material "if it materially affects the insurer's risk or the hazard assumed by the insurer."[97]   A misrepresentation will be considered material "if a reasonable insurance company, in determining its course of action, would attach importance to the fact misrepresented."[98]

Arson can be proved by circumstantial evidence that the fire was intentionally set and that the insured had both motive and opportunity to set the fire.[99]   Thus, for purposes of an arson investigation, information is considered material if it in part "relates directly on whether the [insureds] had a motive to burn their home for the insurance proceeds."[100]

---

[94]     *Id*. at 725 (emphasis added).

[95]     *Id*. (citations omitted).

[96]     *Baymon v. State Farm Ins. Co.*, 2006 WL 2850262, *2 (W.D. Ky), *affirmed* 257 Fed.Appx. 858 (6th Cir. 2007).

[97]     *Davies v. Centennial Life Ins. Co.*, 128 F.3d 934, 943 (6th Cir. 1997).

[98]     *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d. 532, 537 (6th Cir. 2014).

[99]     *State Auto Property & Cas. Ins. Co. v. Hargis*, 2010 WL 1662179, *2 (W.D. Ky.)

[100]    *Baymon*, *supra* at *2

The misrepresentation does not have to be given under oath in order for the concealment or fraud provision to apply.[101]  Further, an insurer need not show that it was actually prejudiced due to the misrepresentations to void the policy.[102]

### B.  Material Misrepresentations Made by Alvey

#### 1.  Alvey's Whereabouts At or Around the Time of the Fire

There is no dispute that Alvey initially told State Farm in her recorded statement (and indeed told fire department and law enforcement officials) that she left her home in Paducah on the morning of Friday, February 19, and did not return to Paducah or her home until the afternoon of Monday, February 22, 2016.  These statements were knowingly false.  Alvey admitted in her EUO that she returned to her home in Paducah on the afternoon of Sunday, February 21, 2016, reportedly as the result of an argument with Standley, sat in her driveway for a few minutes, then promptly made the two-hour drive back to the Nashville area that day.

Alvey admitted in her deposition taken in the course of this litigation that the statements she made to CS Massie in her recorded statement that she left Paducah on Friday morning and didn't return to her home until Monday were not true.[103]  Indeed, Standley testified in his deposition that he had no recollection of ever getting into a fight with Alvey that weekend and had no knowledge that Alvey had returned to Paducah on the afternoon of Sunday.[104]

Alvey's misrepresentations as to her whereabouts at or around the time of the fire made just days after the fire were intentional and knowing.  That she purportedly concealed this fact from State Farm until her EUO because she was embarrassed is not a justification for the misrepresentation that would preclude application of the concealment or fraud provision.

---

[101]   *Baymon v. State Farm Ins. Co.*, 257 Fed.Appx. 858, 862 (6th Cir. 2007)
[102]   *Id.*
[103]   Alvey Depo., pp. 68-72.
[104]   Standley Depo., pp. 46, 62-63 – cited pages attached as Ex. N.

Further, there is no dispute that these misrepresentations were "material" to State Farm's investigation. At that time State Farm had evidence that this was an intentionally-set fire and was in part exploring whether Alvey had opportunity to set this fire. This information was particularly relevant given Chief Cherry's statement to Detective Green that he believed the fire had been out at least 10-12 hours before it was reported meaning the fire had been set sometime prior to Monday, February 22, 2016. There were also no signs of any forced entry indicating that whoever started this fire had access to the home.

Whether Alvey had opportunity to start this fire either before she left Paducah on Friday, February 19, 2016, or when she surreptitiously returned to Paducah on the afternoon of Sunday, February 21, 2016, was plainly "material" to State Farm's investigation of the claim. Courts have consistently held that in an arson investigation, the insureds' statements as to their whereabouts at or around the time of the fire are clearly "material" to the insurer's investigation.

In *Edmiston v. Schellenger*,[105] the insured first told his insurer that he was in the hospital at the time of the house fire issue. In a later deposition, however, the insured for the first time admitted that he left the hospital on the date of the fire and went to the home with his son-in-law. The Mississippi Supreme Court held that "questions concerning [the insured's] activities on the day of the fire were most material, because of the company's need to determine the actual cause of the fire."[106] Based on a similar concealment or fraud provision in the insured's homeowners policy, the Court ruled that the insured's intentional and material misrepresentations voided the policy as a matter of law.

---

[105] 343 So.2d 465 (Miss. 1997).
[106] *Id.* at 467.

In *American Family Mut. Ins. Co. v. Schley*,[107] the insured claimed that he was out of the state in Colorado at the time of the fire to his property in Wisconsin. In later statements, however, the insured admitted that he had actually flown to Minneapolis shortly before the fire, and the odometer of a rental vehicle indicated he had driven 513 miles which was more than the round-trip distance between the Minneapolis airport and the property in Wisconsin where the fire occurred. The Eastern District of Wisconsin held that "the activities of the owner of property which was destroyed by a suspicious fire are pertinent to a claim under this insurance policy" and are therefore "material."[108] The Court rejected arguments that the misrepresentations were not intentional and did not prejudice the insurer, and held that the policy was void under a concealment or fraud provision in the policy.[109]

As in these decisions, Alvey's misrepresentations as to her whereabouts at or around the time of the fire were material and undoubtedly intentional. These misrepresentations alone support application of the concealment or fraud provision to void the policy as a matter of law.

### 2.    Alvey's Prior Insurance History

Alvey also made material misrepresentations regarding her prior insurance history which were material to State Farm's investigation. Indeed, Alvey continued those misrepresentations even after suit was filed during her deposition.

Namely, Alvey attested that in addition to auto and renters policies with Nationwide, she had a personal articles policy covering her wedding ring for $36,000-$37,000.[110] She further continued to insist that she switched from Nationwide to State Farm because of cheaper rates and

---

[107]    978 F.Supp. 870 (E.D. Wisc. 1997).

[108]    *Id.* at 875.

[109]    *See also Collins v. State Farm Fire & Cas. Co.*, 2008 WL 11301049 (E.D. Wisc. 2008) (insured's misrepresentations regarding his whereabouts at or around the time of the fire material to State Farm's investigation and a reasonable basis to deny coverage.)

[110]    Alvey Depo., pp. 57-58.

denied that her Nationwide policy ever canceled or lapsed for nonpayment of premiums.[111]   In fact, Alvey contended that she canceled the policy in December 2015.[112]

As stated above, Kim Homra of Nationwide Insurance testified and provided documentation that Nationwide in fact canceled Alvey's tenant policy the month after it was issued because of nonpayment of premium effective September 2015.  This occurred after Alvey was unable to get a personal articles policy covering her wedding ring with an alleged value of $36,000.  Alvey also admitted in her deposition that she failed to disclose to State Farm during her recorded statement that she had a prior insurance loss for the wedding ring which she believed her child had flushed down the toilet.[113]

Alvey's misrepresentations as to her prior insurance history were also "material" to State Farm's investigation as to whether Alvey had potential motive to burn her home and present a claim for a $36,000 lost wedding ring.  That she previously recovered approximately $18,000 on a loss of her first wedding ring certainly was relevant to whether Alvey believed she could again recover on a claim for a lost or stolen wedding ring of twice that amount in value particularly when she tried unsuccessfully to get coverage on that ring and only did so with State Farm in the month before the loss.  Alvey also falsely stated that she was not canceled when the records and testimony from Nationwide prove otherwise.

The Sixth Circuit in a 2001 decision *Interstate v Musgrove*[114] ruled that an insured's misrepresentations regarding loss history voided a policy under a nearly identical concealment or fraud provision.  In connection with the insurer's investigation on a fire loss claim, the insured in a recorded statement denied that he or his family had made prior insurance claims, then later

---

[111]        *Id.* at 58.
[112]        *Id.* at 59.
[113]        *Id.* at 72-73.
[114]        11 Fed. Appx. 426 (6th Cir. 2001)

admitted in an EUO he and his daughter had sustained fire losses both resulting in insurance claims. The Court ruled that this misrepresentation made during the claim presentation activity was admittedly false and voided the policy as a matter of law resulting in a dismissal of the insured's breach of contract claim.

As in *Musgrove*, in the case at hand Alvey admitted making a misrepresentation in failing to disclose a prior, similar loss involving another wedding ring. Further, she also made repeated false statements that she was never canceled by Nationwide and that she had a personal articles policy on the wedding ring with Nationwide. These material misrepresentations were also sufficient to invoke the concealment or fraud provision and void her policy with State Farm as a matter of law.

### 3. Alvey's Financial Status on the Date of Loss

Finally, Alvey's admitted misrepresentations regarding her financial status at the time of the fire – which also go directly to motive – are material and also void the policy. Alvey admitted in her deposition that beginning in October 2015, she began receiving overdraft fees, which by the time of the fire in February 2016, were roughly $1,000.[115] This directly contradicts her testimony in her EUO that she had no knowledge of any bank overdraft fees.

Further, after being shown her credit card statements and reports, Alvey admitted that her statements in her EUO that she was current on all debts at the time of the fire were false as she was behind on all credit cards.[116] She also acknowledged that two credit reports showed that she had at least two medical bills in collection at the time of the fire which she denied both in her

---

[115]    Alvey Depo., pp. 40-44.
[116]    *Id.* at 73-74.

recorded statement and in her EUO.[117]  In an arson investigation, the insured's financial status at the time of the fire is clearly material as to potential motive.

In a 2006 decision rendered by this Court, *Baymon v State Farm Ins. Co.*,[118] during a fire loss investigation the insureds told State Farm in their recorded statements that they were current on their house payment and property taxes and financially stable.  The insureds in their EUOs later admitted that these statements were false.  This Court ruled that the insureds' financial information was material because the information "relates directly on whether the [insureds] had a motive to burn their home for insurance proceeds."[119] Because the insureds intentionally misrepresented material facts after the loss, this Court voided their homeowners policy with State Farm as a matter of law under the concealment or fraud provision and dismissed the contract and bad faith claims.

The Sixth Circuit then affirmed this decision in 2007 in *Baymon v. State Farm Ins. Co.*[120] and noted that the insureds' false statements as to their financial condition were "in violation of clear policy language, as well as general ethical principles requiring truthfulness in such transactions."[121]  The Court rejected claims that the concealment or fraud provision should not be triggered because the initial statements were not under oath and because State Farm allegedly could not show detrimental reliance or injury.  As in these two *Baymon* decisions, here Alvey's misrepresentations as to her financial status were intentional and material and also void the policy as a matter of law.

---

[117]  Alvey Depo., pp. 76-77.
[118]  2006 WL 2850262 (W.D. Ky.).
[119]  *Id.* at *2.
[120]  257 Fed. Appx. 858 (6th Cir. 2007).
[121]  *Id.* at 861.

## II.    ALVEY'S BAD FAITH CLAIMS MUST ALSO BE DISMISSED BECAUSE SHE CANNOT PRESENT SUFFICIENT EVIDENCE TO SATISFY ANY ELEMENT OF A BAD FAITH CAUSE OF ACTION.

Alvey also claims that State Farm committed statutory and common law first-party bad faith in failing to fully pay her property damage claim.[122]   Although this Court by Opinion entered on June 28, 2017 (DE 12) bifurcated and stayed discovery on the bad faith claims until the underlying contract claim is resolved, the evidence and argument cited above establish that the bad faith claims should also be dismissed as a matter of law.

Kentucky courts apply the same standard for bad faith claims whether they are first-party or third-party claims and whether they arise from common law or statute.[123]   Under this standard, Alvey must present sufficient evidence of the following three elements in order to present a cause of action for bad faith to a jury:

> (1)    The insurer must be obligated to pay the claim under the terms of the policy;
>
> (2)    The insurer must lack a reasonable basis in law or fact for denying the claim; and
>
> (3)    It must be shown that the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed.[124]

The Kentucky Supreme Court focused on the first element of a bad faith claim in a 2000 decision, *Davidson v. American Freightways, Inc.*,[125] where plaintiffs alleged that a self-insured trucking company violated the Unfair Claims Settlement Practices Act ("UCSPA") in failing to engage in good faith settlement negotiations of their bodily injury claims.   After a thorough examination of the principles behind common law and statutory bad faith, the Court held that the

---

[122]    Complaint, Counts II and III.
[123]    *Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 526-27 (6th Cir. 2006).
[124]    *Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1993).
[125]    25 S.W.3d 94 (Ky. 2000).

self-insured company could not be liable for bad faith as a matter of law because it had no contractual obligation to pay the third-party claim under an insurance policy:

> The gravamen of the UCSPA is that an insurance company is required to deal in good faith with a claimant, whether an insured or a third party, with respect to a claim which the insurance company is contractually obligated to pay. Absent a contractual obligation, there simply is no bad faith cause of action, either at common law or by statute. [126]

The Kentucky Court of Appeals expounded on *Davidson* in a 2004 decision, *Ky. Nat'l. Ins. Co. v. Shaffer*,[127] where a liability insurer defended a claim and paid a judgment. After trial, however, it was discovered that there was no coverage under the insurer's policy for the accident at issue. Even though there was evidence that the liability insurer did not conduct an adequate investigation and only offered its policy limits after trial had started, the Court nonetheless held that because the insurer had no contractual obligation to pay the third-party claims, the claimants could not pursue a bad faith claim against the insurer as a matter of law.

Following this clear precedent, Kentucky courts have consistently required that a claimant prove that the insurer had a contractual obligation to pay a claim under an insurance policy in order to pursue a bad faith claim. To this end, Kentucky federal district courts have repeatedly dismissed bad faith claims as a matter of law where the policy provisions precluded an obligation to make payment under the policy.[128]

---

[126]   *Id* at 100.
[127]   155 S.W.3d 738 (Ky. App. 2004).
[128]   *See, e.g., Muscutt v. Allstate Prop. & Cas. Ins. Co.,* 2014 U.S. Dist. LEXIS 125729 (W.D. Ky.) (where homeowners insurance policy excluded coverage for water damage, bad faith claim based on denial of claim dismissed); *C.A. Jones Management Gr., LLC v. Scottsdale Indem. Co.*, 2016 U.S. Dist. LEXIS 80811 (W.D. Ky.) (where no coverage for liability claim presented outside policy period, bad faith claim based on denial of claim dismissed); *Acuity Ins. Co. v. Higdons' Sheet Metal & Supply Co., Inc.*, 2007 U.S. Dist. LEXIS 24997 (W.D. Ky.) (where CGL policy did not cover property damage occurring outside policy period, bad faith claim based on denial of claim dismissed); *Travelers Prop. Cas. Co. of Amer. v. B&W Resources, Inc.*, 2006 U.S. Dist. LEXIS 78311 (E.D. Ky.) (where commercial liability policy excluded property damage claim, bad faith claim based on denial of claim dismissed).

Indeed, this Court and the Sixth Circuit in the *Baymon* decisions cited above expressly dismissed the insureds' bad faith claims because State Farm did not have a contractual obligation to pay on a fire loss claim based on the insureds' violation of the concealment or fraud provision. Because State Farm has no contractual obligation to pay Alvey's fire loss claim, it cannot be held liable for bad faith in denying said claim as a matter of law.

Even if this Court were to somehow find that there are questions of fact precluding summary judgment on the contract claim, Alvey's bad faith claims still must be dismissed. Alvey cannot present sufficient evidence to establish either the second or the third element of a bad faith claim.

Under the second element, State Farm clearly had a reasonable basis to deny the property damage claim.  As noted, Alvey made multiple misrepresentations of fact in the presentation of her claim which were knowingly false and material to State Farm's investigation.  Though not a basis for summary judgment in this motion, State Farm also had ample circumstantial evidence that the fire was intentionally set and that Alvey had opportunity and financial motive to start the fire.  Alvey may offer arguments to contest these defenses, but she cannot contest that State Farm at the very least had a reasonable basis to deny the claim.

The Kentucky Supreme Court recently provided further guidance on the proof necessary to prevail on a bad faith claim in *Hollaway v. Direct General Ins. Co. of Miss., Inc.*[129]  There the insurer offered a nominal amount for a soft-tissue claim arising from a low impact collision, and after suit was filed settled the claim for just under the liability limits.  The trial court granted summary judgment on the bad faith claim and the claimant appealed.

The Court first confirmed that a claimant must present sufficient evidence to support all three elements of a bad faith claim.  Where an insurer's "absolute duty to pay [a] claim is not

---

[129]    497 S.W.3d 733 (Ky. 2016).

clearly established" a bad faith claim may not be pursued.[130]   The Court also ruled that proof under the third element requires evidence of "punitive conduct" on the part of the insurer involving "malevolent intent" or "intentional misconduct" in the handling of the claim.[131]   In the case at hand, there is certainly no evidence that State Farm engaged in intentional misconduct in denying the claim based on the facts of this case.  Alvey's bad faith claims therefore must also be dismissed as a matter of law.

## **CONCLUSION**

The parties have completed discovery and the case is ripe for summary judgment.  Alvey has admitted that she made misrepresentations regarding her whereabouts at or around the time of the fire, her prior insurance history, and her financial status at the time of the fire.  Because these misrepresentations were material to State Farm's investigation and intentional, Alvey's claim is barred by State Farm's Concealment or Fraud policy provision as a matter of law.  Alvey's bad faith claims must also be dismissed because State Farm has no contractual obligation to pay her claim, State Farm had a reasonable basis for its denial, and there's no evidence that State Farm engaged in any intentional misconduct that would support a bad faith claim.

BOEHL STOPHER & GRAVES, LLP

*/s/David T. Klapheke*
David T. Klapheke (KY Bar #86153)
400 West Market Street, Suite 2300
Louisville, KY 40202
Phone:  (502) 589-5980
dklapheke@bsg-law.com
COUNSEL FOR DEFENDANT STATE FARM

---

[130]    *Id.* at 738.
[131]    *Id.* at 739.