UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT PADUCAH
CIVIL ACTION NO. 5:17-CV-00023-TBR

HEATHER ALVEY,                                                     PLAINTIFF

v.

STATE FARM
FIRE AND CASUALTY COMPANY,                     DEFENDANTS

**MEMORANDUM OPINION**

This matter is before the Court on a Motion for Summary Judgment filed by Defendant State Farm Fire and Casualty Company. (R. 40). Fully briefed, these matters are ripe for decision. For the reasons set forth below, the Court HEREBY GRANTS THE DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT.

In February of 2016, a fire damaged Heather Alvey's residence, garage, and personal property. (Alvey's Compl. ¶ 4). Alvey had purchased renter's insurance with State Farm Fire and Casualty Company in January of 2016, a month prior to the fire. (Alvey EUO, pp. 52-55). Alvey initially submitted a claim to State farm for $100,000 for fire damage, and $36,000 for a lost wedding ring set. (Alvey Recorded Statement, pp. 10, 37-38). After investigation, State Farm denied Alvey's claim. Alvey then sued State Farm for breach-of-contract, commonlaw and statutory bad faith, and declaratory judgment. (Alvey Compl.). State Farm removed the case and now moves for summary judgment, arguing Alvey has voided her policy under its Concealment or Fraud provision. (State Farm's Mot. for Summ. J.).

1

BACKGROUND

    A. Alvey Discovers the Fire, and the Authorities Investigate.

On Friday morning, February 19, 2016, Alvey left her home with her children, dropped them off at school, and headed to her work office in Paducah. (Alvey EUO, p. 77). Alvey started working for Mass Mutual selling life insurance shortly after a divorce and moving to Paducah from Metropolis. (Alvey Depo., pp. 33-35; Alvey EUO, pp. 17-19). She only stayed at the Paducah office until around 9:00 AM, at which point she headed to Nashville, Tennessee for the weekend to stay with her boyfriend, Toney Standley. (Alvey EUO, p. 77). Standley is a firefighter who Alvey began seeing in 2015. (Alvey EUO, p. 65). Standley lives in Nashville, and Alvey often spent the weekends there. (Alvey EUO, pp. 66-77). Alvey arrived at her work office in Nashville at around noon and had lunch with Standley. (Alvey EUO, pp. 78-80).

Alvey and Standley spent the weekend together in Nashville, and Standley returned with Alvey to Paducah on Monday, February 22, 2016 at around 2:00 PM. (Alvey EUO, pp. 95-96). The two went to a Doctor's appointment for Alvey and then stopped at Gander Mountain to shop afterward. They arrived at Alvey's home at around 4:00 PM. (Alvey EUO, p. 96). Upon arriving, Standley smelled smoke and told Alvey to wait outside while he went in. (Alvey EUO, pp. 96). Standley discovered that there had been a fire in the living room. (Alvey EUO, pp. 98-99). The fire was no longer burning.

Alvey called the non-emergency number for the Paducah Fire Department, and Deputy Fire Chief, Greg Cherry, arrived on scene. (Chief Cherry Depo., p. 14). Upon arrival, Chief Cherry observed no signs of forced entry. (*Id.* at 37). Chief Cherry concluded that the fire had started in the living room area and thought the fire suspicious because there was no indication that it was accidental. (*Id.* at 52, 64). After walking through the house, Alvey told Chief Cherry

that cash and jewelry were missing, and he called the police. (*Id.* at 47, 65).

Austin Guill arrived on scene for the Paducah Police Department to investigate the possible theft. Officer Guill also found no signs of forced entry. (Officer Guill Depo., pp. 8-10, 14). Alvey told Officer Guill that around $1,500 was missing along with four pieces of jewelry collectively valued at $500. (*Id.* at pp. 21-22). According to Officer Guill, Alvey made no mention of the $36,000 ring she would later claim was missing. (*Id.* at p. 22). Based on Alvey's statements, Officer Guill determined that a detective needed to investigate further. (*Id.* at p. 27).

Detective Beau Green of the Paducah Police Department arrived on scene to investigate both the possibility of burglary as raised by Alvey's allegations, and the possibility of arson as raised by Chief Cherry's suspicions. Alvey reported the $1,500 in missing cash to Detective Green, but for the first time Alvey also reported to Detective Green that a wedding ring set valued at $30,000 was missing along with the cash. (Detective Green Depo., p. 25). Alvey told Detective Green that the cash was taken from a compartment on the top of her jewelry box, and that the rings had been taken from a drawer in the jewelry box. (*Id.*). However, according to Detective Green, Alvey could not have opened the top compartment of the jewelry box to discover the cash was missing because the soot on top of the jewelry box remained undisturbed. (*Id.* at pp. 25-31, 40-41).

More than a year after the fire, in July of 2017, Alvey advised Detective Green that she found the missing wedding ring set in her daughter's jewelry box. (*Id.* at p. 47). Alvey still claims the cash is missing. (*Id.*). Neither the police, nor the fire department have been able to determine the cause of the fire. (*Id.* at pp. 53-54).

B. State Farm Denies Alvey's Claim After Their Own Investigation, and Alvey Brings Suit.

Alvey filed a claim with State Farm for $100,000 for fire damage, and another $36,000

for the missing wedding ring set. (Proof of Loss dated April 21, 2016). On February 24, 2016, Alvey's claim was turned over to State Farm's Special Investigation Unit ("SIU") based on the presence of several National Insurance Crime Bureau fraud indicators. (Def.'s Mot. for Summ. J., Ex. K, Claim File Notes). As part of the SIU's investigation, Alvey gave a recorded statement to State Farm on March 8, 2016, and Claims Specialists Debra Massie conducted an examination under oath ("EUO") with Alvey on June 15, 2016. (Alvey Recorded Statement; Alvey EUO). Based on their investigation, State Farm denied Alvey's claim on September 7, 2016, on three grounds: (1) State Farm concluded that Alvey had breached the terms of her insurance contract by committing arson, (2) Alvey had made material misrepresentations in presentation of her claim, and (3) Alvey failed to follow policy duties requiring her to mitigate her damages and comply with document requests. (Lee Depo on May 3, 2018, pp. 15-19).

On January 31, 2017, Alvey sued State Farm in McCracken County Circuit Court for breach-of-contract, common law and statutory bad faint, and for declaratory judgment. State Farm then removed the case to this Court. On June 28, 2018, the Court granted State Farm's request to bifurcate, and stay discovery on, Alvery's bad-faith claims pending the breach-of-contract claim's resolution. (R. 12). As a part of discovery, Alvey's deposition was taken on November 7, 2017.

DISCUSSION

State Farm now moves for summary judgment on Alvey's breach-of-contract claim, arguing that her policy is void pursuant to its Fraud or Concealment provision because Alvey made material misrepresentations to State Farm during its investigation of the fire. The Fraud or Concealment provision of Alvey's policy, which State Farm argues Alvey violated, reads in full:

> **Concealment or Fraud.** This policy is void as to you and any other insured, if you or any other insured under this policy has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance, whether before or after a loss.

(Def.'s Mot. for Summ. J., Ex. M, Alvey's Renter's Policy, p. 7: ¶ 2). According to State Farm, Alvey violated the provision by making material misrepresentations concerning her whereabouts at or around the time of the fire, her prior insurance history, and her financial status at the time of the fire. State Farm also moves for summary judgment on Alvey's bad faith claims, arguing that because Alvey's material misrepresentations voided the policy, State Farm has no obligation to pay her claim.

Alvey responds that State Farm has only proven that Alvey, at most, made small factual mistakes—not intentional misrepresentations, which would warrant voiding the policy. Alvey contends further that determining whether her statements constitute a misrepresentation inherently requires an evaluation of credibility, making it an issue to be decided by the jury—not the Court upon summary judgement. Similarly, Alvey argues that because the policy fails to define the term "material," whether any potential misrepresentations made by Alvey are material is a factual question to be decided by the jury. Finally, Alvey, asserts that this Court bifurcated and stayed proceedings on her bad faith claims until after her breach of contract claim is resolved. According to Alvey, for State Farm to move for summary judgment on the bad faith claims at this time is inappropriate and in violation of Court Order. As such, Alvey refuses to respond substantively to State Farm's argument on the issue. The Court will address first Alvey's breach-of-contract claim and then come to the bifurcated bad faith claims.

A. Alvey's Breach-of-Contract Claim

As an initial matter, the Court notes that concealment or fraud provisions in insurance

contracts, like the one at issue here, are routinely enforced by courts, and Alvey makes no argument challenging provision's validity. *Wright v. Grange Mut. Cas. Co.*, No. 3:13-CV-00747-CRS, 2015 U.S. Dist. LEXIS 35733, at *5 (W.D. Ky. Mar. 23, 2015) ("Such provisions are 'common to most fire insurance policies and . . . uniformly held valid." (quoting *Home Ins. Co. v. Hardin*, 528 S.W.2d 723, 725 (Ky. 1975) (quoting *World Fire & Marine Ins. Co. v. Tapp*, 279 Ky. 423, 130 S.W.2d 848, 849-50 (Ky. 1939)))). Thus, State Farm's Motion, and Alvey's Response thereto, raise two questions. First, without making a judgment as to credibility, can the Court conclude from the Record that Alvey has made intentional misrepresentations as a matter of law. Second, if Alvey has made misrepresentations, can the Court determine those misrepresentations to be material as a matter of law. If the answer to both these questions is yes, Alvey's policy is void pursuant to its Concealment or Fraud provision, and State Farm is entitled to summary judgment on Alvey's breach-of-contract claim.

Alvey gave three separate statements in connection with her claim. First, Alvey gave a recorded statement to State Farm Claims Specialist Deborah Massie on March 8. Then on June 15, 2016, she was examined under oath by Claims Specialist Massie. Finally, on November 7, 2017, after Alvey filed suit, State Farm deposed Alvey. State Farm argues that comparing these three statements proves Alvey made material misrepresentation about three things: (a) her whereabouts at or around the time of the fire, (b) her prior insurance history, and (c) her financial status at the time of the fire. The Court will address each argument in turn, first analyzing whether Alvey has objectively made a misrepresentation, and then analyzing whether that misrepresentation is material as a matter of law.

1. Alvey Intentionally Conceals her location on Sunday the Weekend of the Fire.

State Farm argues that Alvey intentionally misrepresented, or at least intentionally

concealed, her whereabouts on Sunday the weekend of the fire. Conversely, Alvey argues that "[Alvey] never actually made a false statement." Instead, State Farm "entirely relies on its erroneous, subjective interpretation of Heather's answers during one of multiple interviews she consented to without any representation and asserts this is somehow proof" of misrepresentation. The Court disagrees.

In her recorded statement, Alvey indicated to Claims Specialist Massie that she was in Tennessee from Friday, February 19 until Monday, February 22. First Alvey was questioned broadly about the weekend:

> Q. Okay. Kind of give me a rundown then from what happened that Friday morning like when you first got up.
> A. Um, we got up. And got ready like normal. I was getting ready. I said I usually get up at 7:15. Get them up about 7:30. They start getting ready. They'll go downstairs. And, you know, get drinks or something to eat or whatever. And then um, we left about…I think we left…usually we leave between 8:00 and 8:15. But I think we left close to 8:00 that morning because I had to run to my office here in Paducah. Then I had to be in Brentwood by noon. So um, took them to school. Probably was at my office…I mean I know I was there by 8:30. Out here in…in Paducah. And I was there until uh…I think I left there somewhere around 10:00 I know because I was in Nashville about five minutes 'til 12:00 about. I had…had to be at the office in Nashville on Friday. Saturday birthday parties. And uh, uh, banquet to be to…be at for work Saturday. And then Sunday. And then Monday I had to be back in the office in Brentwood to pick some paperwork and stuff up. I left from there about…I don't know…11:30 or 12:00. And got back to Paducah about 12:00…or about 2:15. Doctor's appointment, so…

(Def.'s Ex. D. Alvey's Recorded Statement, p. 24). Then Alvey was asked specifically what she did on Sunday:

> Q. Good. And then Sunday, what did you do all day Sunday?
> A. Oh, he worked. I stayed home most of the day. And just did ... didn't do much of anything. Um, and I went to the fire station on Monday (sic) afternoon. I was at the fire station until about. .. actually ...
>
> Q. Sunday or Monday?
> A. Sunday.
> Q. Okay. Uh, so ...
> A. Yeah, he worked Sunday. He had to work. So, he goes in at six o'clock, or

7

> well he goes in at like 5:30. But ...
>
> Q. P.M.?
> A. Morning.
>
> Q. Okay.
> A. They work 24 hours. So ...
>
> Q. I see.
> A. ... he goes in. So, I just went. And um, I ate lunch there or not. .. in the afternoon. And I think I left about 9:00 or 10:00.
>
> Q. At night?
> A. Um-hum.
>
> Q. And stayed uh ... did you go back to his ... his house ...
> A. Yeah.
>
> Q. ... after that then?
> A. Yeah.
>
> Q. And uh, so from 9:00 o-r 10:00 at night...that night, then Monday morning uh, what did you do?
> A. We got up. And office ... I'm trying to think of what time. About 10:30 ... 10:00. Probably about 10:00 we left. And it takes about 30 minutes to get to Brentwood from there. I had to run in the office. And pick up some stuff. And then went and ate lunch. And then headed home.

(*Id.* at p. 28). Nowhere in these statements does Alvey ever mention leaving Tennessee, being back in Paducah, or coming home for any reason.

However, three months later, in her examination under oath, Alvey testified that she was not in Tennessee for the entire weekend, but instead that she came home to Paducah on Sunday afternoon after a fight with Standley. According to Alvey, she got all the way to her residence in Paducah, realized she forgot a paycheck at her Tennessee office while she was still in her driveway, and then went back to Tennessee to retrieve the check without entering her home. Alvey admitted to concealing the fact that she was at her residence on Sunday afternoon first in her examination under oath:

8

> Q. And the reason that you didn't disclose that before was because you didn't want State Farm to know you were having - -
> A. No.
>
> Q. - - money trouble?
> A. I mean, that or my boyfriend. I'm not going to ask him to go pick up a check. Hey, I need that check.
>
> Q. He didn't know you were having financial troubles?
> A. No
>
> …
>
> Q. So why are you telling us today about it then?
> A. I'm just trying to be honest.

(Def.'s Ex. B. Alvey's EUO, pp. 85-86, 90-92). Then Alvey admits to concealing it again in her deposition:

> Q. First of all, you did tell State Farm that you left the home in Paducah on Friday, that you were in Nashville all weekend and did not return to the home until Monday afternoon, correct?
> A. Yes.
>
> Q. All right. And it looks like from Mr. Dunn - - do you remember speaking to Mr. Dunn the fire investigator and being interviewed by him at the scene?
> A. Yeah. I don't remember which one that was though.
>
> Q. Okay. And did you tell him the same thing, that you had left Paducah on Friday morning and not returned until Monday afternoon?
> A. Yes.
>
> Q. And the fire department officials who interviewed you, did you tell them the same thing?
> A. Yes…
>
> Q. Do you agree that you initially told State Farm that you had left Paducah on Friday morning and did not return until Monday?
> A. Yes.
>
> Q. And that was not true, correct?
> A. Yes.

(Alvey Depo., pp. 66-67, 72).

Alvey claims that "Defendant's very interpretation of Heather's statements is a wholly debatable question of fact and credibility that should be decided by a jury." However, Alvey's statements require no interpretation, nor do they require an assessment of credibility. In her recorded statement to Claims Specialist Massie, Alvey stated she was in Tennessee from Friday, February nineteenth until Monday, February twenty-second. Then, three months later in her examination under oath, Alvey stated that she did not remain in Tennessee that entire weekend. Instead, she admits that on Sunday afternoon she drove from Tennessee to her home. She drove into her driveway, but never entered her home. She returned to Tennessee. She admitted to concealing this information again in her deposition after suit was filed. She admitted she initially told the fire investigator, fire department officials, and State Farm that she left Paducah on Friday and did not return to Paducah until Monday. She further admitted that was not the truth. The truth was Alvey returned to Paducah that Sunday afternoon.

This is not an instance of conflicting prior statements that could create an issue of fact or require an assessment of credibility. Alvey does not now contend that in fact she was in Tennessee the entire weekend. Furthermore, while intent is typically a factual question that must be decided by the jury, Alvey reveals her intentions so clearly that the Court can objectively say she intentionally concealed her whereabouts. When asked by State Farm—under oath—why she concealed her whereabouts on Sunday afternoon, Alvey admitted that she concealed them to hide from State Farm and Standley the fact that she was having "financial troubles." Alvey's answer reveals her intent to conceal and removes the possibility that Alvey simply forgot that she came home on Sunday or that she made a mistake. Thus, the Court finds that Alvey indisputably concealed her location the weekend of the fire.

2. Alvey's location the weekend of the Fire is Material as a Matter of Law.

Next, the Court must determine whether Alvey concealing her location the weekend of the fire is material. Alvey argues that because her insurance policy does not define the term material, and because State Farm's corporate representative could not adequately define it, the term is ambiguous. As such, according to Alvey, the issue is factual and must be left to a jury. State Farm, on the other hand, argues that Alvey's argument is unsupported, and the issue may be decided by the Court as a matter of law. The Court Agrees.

First, the fact that the term "material" is not defined by the policy, and that State Farm's corporate representative failed to properly define it, does not demonstrate ambiguity, nor does it require the term to be defined by jury. Under Kentucky law, an insurance policy is a contract, and contract interpretation is typically a question of law to be determined by courts. *State Farm Mut. Ins. Co. v. Fireman's Fund Am. Ins. Co.*, 550 S.W.2d 554, 557 (Ky. 1977) (holing insurance policies to be governed by the principles of contract law); *Kentucky Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 695 (Ky. 2016) (holding contract interpretation to be generally a matter of law). Thus, contrary to Alvey's suggestion, the Court is not required to turn the term over to a jury for definition. Instead, interpretation is the Court's task.

But the Court has instruction. Where, as here, the state's appellate courts have not addressed the issue presented, the federal court is obligated by the *Erie* Doctrine to predict how the state's highest court would rule. *Allstate Ins. Co. v. Thrifty Rent-A-Car Sys.*, 249 F.3d 450, 454 (6th Cir. 2001). In *Fryman for Fryman v. Pilot Life Ins. Co.*, 704 S.W.2d 205 (Ky. 1986), the Kentucky Supreme Court, in determining the definition of a term which the policy failed to define, held that because the term had "never acquired a technical meaning in law," the term "must be interpreted according to the usage of the average man and as [it] would be read and understood by him in light of the prevailing rule that uncertainties and ambiguities must be

resolved in favor of the insured." Thus, under Kentucky law, when a court encounters a term that has not acquired specific definition through the law or through the contract itself, the court must determine the ordinary meaning of the term and resolve ambiguity, if any, in favor of the insured.

Here however, while the term is not defined the policy, it has acquired a technical meaning under Kentucky law. Kentucky courts have not yet explicitly defined the term "material" in dealing with the insurance claims process. However, they have repeatedly defined the term with regard to the application process: "The rule is that a false answer is material if the insurer, acting reasonably and naturally in accordance with the usual practice of life insurance companies under similar circumstances, would not have accepted the application if the substantial truth had been stated therein." *John Hancock Mut. Life Ins. Co. v. Conway*, 240 S.W.2d 644, 646 (Ky. 1951); *See also Mills v. Reserve Life Life Insurance Co.*, Ky., 335 S.W.2d 955. ("In a long line of cases it has been very definitely established by this Court that a false answer is material if the insurer, acting reasonably and naturally in accordance with the usual practice of life insurance companies under similar circumstances, would not have accepted the application if the substantial truth had been stated therein."). In other words, under established Kentucky law, a misrepresentation in the application process is "material" if it significantly affects the insurance company's decision.

This Court has no reason to believe that the Kentucky Supreme Court would adopt a different definition for the term in addressing the claims process, including the insurance company's subsequent investigation. The Court believes that the Kentucky Supreme Court would still deem the misrepresentation material if it significantly affected the insurance company's decision. But instead of the decision being whether to issue the policy, the decision

12

would be whether to pay out on the claim. Not only does this definition track Kentucky law, it also comports with the broader legal definition generally assigned to the term. *See* Black's Law Dictionary 441 (2nd ed. 2001) (defining "material" as "[h]aving some logical connection with the consequential facts," or "[o]f such a nature that knowledge of the item would affect a person's decision-making process; significant; essential"). Thus, the Court believes that under Kentucky law, a misrepresentation or concealment made during the claims process, including the insurance company's investigation of that claim, would be considered material when it has the potential to significantly affect the insurance company's decision to payout on the claim.[1]

With the term "material" now defined, the next question is whether the Court may determine Alvey's location the weekend of the fire material as a matter of law. Alvey insists that such a determination must be left to the jury. State Farm disagrees.

The Court finds guidance in the jurisdiction on whether such a determination is one of fact to be decided by the jury or whether it is a matter of law to be decided by the courts. As State Farm correctly points out, Kentucky state courts, Kentucky federal courts, and the Sixth Circuit have all enforced concealment or fraud provisions, just like the one at issue here, as a matter of law. *See, e.g., Home Ins. Co. v Hardin*, 528 S.W.2d. 723 (Ky App. 1975) (the insured's claim for non-existent items voided a fire loss claim as a matter of law under the policy's concealment or fraud provision, which required the misrepresentation or concealment to be material); *Hardison v. State Farm Fire & Cas. Co.*, 2010 W.L. 11565497 (W.D. Ky.) (the insured concealing that a golf cart was not stolen voided the policy as a matter of law under the policy's concealment or fraud provision, which required the concealment to be material). Of

---

[1] In the Eastern District, Judge Hood very recently came to a substantially similar conclusion and definition when addressing this same issue. *See Proctor v. GEICO Gen. Ins. Co.*, No. 17-cv-348-JMH-MAS, 2019 U.S. Dist. LEXIS 92 (E.D. Ky. Jan. 2, 2019).

particular significance is *Baymon v. State Farm Ins. Co.*, 2006 W.L. 2850262 (W.D. Ky) where the insured's false statements as to financial status at the time of the loss were material and voided coverage as a matter of law. At the appellate level, the Sixth Circuit in, *Baymon v. State Farm Ins. Co.*, 257 Fed. Appx. 858 (6th Cir. 2007), confirmed that the insured's false statements as to financial status at the time of the loss were material and voided coverage as a matter of law. Implicit, in all those rulings is the fact that the Court may determine whether a misrepresentation is material as a matter of law. Even looking to other jurisdictions, in which the determination has been explicitly deemed a mixed question of law and fact, a concealment or misrepresentation may be determined material as a matter of law when "reasonable minds cannot differ on the question of materiality." *Gould v. American-Hawaiian S.S. Co.*, 535 F.2d. 761, 771 (3rd Cir. 1976). *See also Wagnon v. State Farm Fire & Cas. Co.*, 146 F.3d. 764, 768 (10th Cir. 1998). Thus, at least with regard to these specific facts, the Court can determine materiality as a matter of law. In fact, other courts have determined materiality as a matter of law.

Reasonable minds cannot differ on the question of whether Alvey's concealment was material to State Farm's investigation and decision to pay out on Avley's fire loss claim. Alvey left her house on Friday. On Monday it was discovered that a fire had occurred that weekend. Alvey concealed the fact that she drove all the way home to Paducah and then all the way back to Tennessee during that weekend even when directly asked by State Farm to describe her whereabouts on the days in question. This is exactly the type of concealment that would impede an insurance Company's claims investigation. The fact that Alvey was home Sunday the weekend of the fire provides her with opportunity to start the fire herself, and makes more likely the possibility that she did, as opposed to being in Tennessee where it would be impossible for her to start the fire. Whether Alvey had an opportunity to start the fire significantly affects State

Farm's decision to pay out Alvey's claim.

Furthermore, as noted above, in *Baymon v. State Farm Ins. Co.*, 257 F. App'x 858 (6th Cir. 2007), the Sixth Circuit, without directly addressing materiality, upheld an opinion by Judge McKinley's in which he found an insured's financial status to be material for the purposes of voiding coverage under a concealment or fraud provision similar to the one at issue here. According to Judge McKinely, the financial status of the insured was material because the "information relates directly on whether the [insureds] had a motive to burn their home for the insurance proceeds." *Baymon v. State Farm Ins. Co.*, No. 4:03CV-184-M, 2006 U.S. Dist. LEXIS 72490, at *6 (W.D. Ky. Oct. 2, 2006). Motive and opportunity go hand in hand. If facts that suggest motive are material, so too must be facts that suggest opportunity. Here, Alvey's location that weekend directly relates to whether she had opportunity to start the fire, just like the insured's financial status directly related to motive in *Baymon.* Thus, Alvey's concealment is material.[2] As such, Alvey's policy is void pursuant to its Concealment or Fraud provision, and the Court need not address Alvey's other alleged material misrepresentations. However, the Court must still address Alvey's bad faith claims.

B. Alvey's Bifurcated Bad Faith Claims

State Farm also moves to dismiss Alvey's bad faith claims, arguing that based on the facts above they were not obligated to pay the claim. Alvey argues that to dismiss her bad faith claims at this point would be improper because the Court bifurcated and stayed those claims pending the resolution of her contract claim. However, Alvey's contract claim has been resolved herein, and based on the findings above, the Court sees no reason to delay ruling on the bad faith

---

[2] The Court notes that it is making no comment on whether Alvey indeed started the fire herself, rather it is stating that her whereabouts around the time of the fire are plainly significant to an investigation of whether she did or did not, and that such an investigation is material to whether State Farm pays out on her fire loss claim.

claims, nor has Alvey presented one to the Court. Such a delay would only serve to waste the Party's resources and the Court's time.

Alvey brings both common law and statutory bad faith claims. Kentucky requires the same elements for both: (1) The insurer must be obligated to pay the claim under the terms of the policy; (2) The insurer must lack a reasonable basis in law or fact for denying the claim; and (3) It must be shown that the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed. Based on the findings and conclusions above, Alvey's policy is void pursuant to the Concealment or Fraud provision. As a matter of law, State Farm is not obligated to pay Alvey's claim. Thus, Alvey's bad faith claims must be dismissed. *Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 526-27 (6th Cir. 2006)

CONCLUSION

Based on the findings and conclusion above the Court holds that Alvey has voided her insurance policy with State Farm pursuant to its Concealment or Fraud provision. Thus, her breach-of-contract claim fails as a matter of law, and State Farm is entitled to summary judgment. Furthermore, based on the findings and conclusions above, the Court hereby grants State Farm summary judgment on Alvey's bad faith claims.

*Thomas B. Russell*

Thomas B. Russell, Senior Judge
United States District Court

January 18, 2019

cc. Counsel of Record